THE STATE, EX REL. BURROUGHS, *v*. WEBSTER ET AL.

[No. 18,598.   Filed June 7, 1898.]

PHYSICIANS.—*License.*— *Evidence*— *Statute Construed.*— Under sections 2 and 5 of the act of March 8, 1897, providing the manner in which a physician holding a license to practice medicine under the preceding law may procure a new license and continue in the practice, the former license is only *prima facie* evidence of the right to a new one.   *p. 613.*

The State, *ex rel.* Burroughs, *v.* Webster *et al.*

PHYSICIANS.—*License.—Revocation.*—The provisions of section 5 of the act of March 8, 1897, that a physician guilty of certain misconduct may have his license revoked by the State Board of Medical Registration and Examination, has no application to licenses issued under a former act to regulate the practice of medicine. *pp. 613, 614.*

SAME.—*License.—Revocation.—Notice.*—The act of March 8, 1897, to regulate the practice of medicine, revokes by implication all former licenses held by physicians, and one who applies for a new license takes notice of whatever action the board may take thereon. *pp. 614, 615.*

SAME.— *License.— Constitutional Law.—Police Power.*—The act of March 8, 1897, making it unlawful to practice medicine without a license, and denying to all physicians in the State, lawfully engaged in the practice, the right to continue such practice, until they conform to the requirements of the statute, and restricting the practice of medicine to persons who are able to demonstrate their qualifications to the State Board of Medical Registration and Examination created by the act, is constitutional, being a proper exercise of the police power of the State. *pp. 615-621.*

SAME.—*Board of Registration and Examination Not a Judicial Body.*—The State Board of Medical Registration and Examination, which, under the act of March 8, 1897, passes upon the qualifications of applicants for licenses to practice medicine, is not a judicial body, though the statute provides for an appeal from the decision of such board. *p. 621.*

From the Marion Superior Court. *Affirmed.*

*Byron K. Elliott, William F. Elliott, James W. Noel* and *Frank J. Lahr,* for appellant.

*William A. Ketcham,* Attorney-General, and *Merrill Moores,* for appellees.

HOWARD, J.—This was an action brought by the relator, in the name of the State, for a writ of mandate, to require the appellees, who constitute the State Board of Medical Registration and Examination, to issue to him a certificate entitling him to a license to practice medicine, under the provisions of an act of the General Assembly regulating the practice of medicine, and for other purposes, approved March 8, 1897. Acts 1897, p. 255; section 5352a, Horner's R. S. 1897, and following sections. On the issue of an alterna-

tive writ, as prayed for, the appellees made return, and to this return the relator filed his demurrer. A supplemental return was also made to the alternative writ, to which exceptions were filed. A demurrer was also filed to the return as a whole, including the supplemental return. Both demurrers were overruled, as were also the exceptions to the supplemental return. Judgment was then entered, that the relator take nothing by his action.

In his complaint the relator recites that he has been practicing medicine in Indiana continuously since September 19, 1896, under a license regularly issued on that day by the clerk of the Marion Circuit Court, according to the law regulating the practice of medicine in force prior to the act of 1897. Acts 1885, p. 197, section 7318, *et seq.*, Burns' R. S. 1894. In his complaint he also sets out his application and affidavit for a certificate to practice medicine under the new law, showing that he was a graduate, in 1893, of the American Eclectic Medical College of Cincinnati, and in 1897 of the American Medical College of Indianapolis. He also exhibits an affidavit filed with the board to the effect that he has not been guilty of felony or gross immorality, and is not addicted to the liquor or drug habit, and that his general reputation for moral character is good. He also recites a tender to the board of a dollar as a license fee, as provided in the act, and says that he has repeatedly demanded a certificate, and that the board has refused to issue him one, and he prays an alternative writ of mandate, requiring the defendants to issue him a certificate entitling him to a license to practice medicine.

The appellees, in their return, set up, in brief, that they have been delayed in acting upon relator's application, by reason of the great amount of work re-

quired for the satisfactory discharge of their duties; that they have been notified verbally that charges would be filed against the relator, and for that reason have postponed action upon his case, which is still pending.

In the supplement to the original return, filed a day or two thereafter, it is averred that on October 19, 1897, written charges were filed with the board in the matter of the application of John A. Burroughs for a certificate entitling him to be licensed to practice medicine, charging that the licenses received by him on September 19, 1896, and March 26, 1897, were obtained by misrepresentation as to the character of the colleges upon whose diplomas the licenses were granted, and that he has been and is guilty of gross immorality in seeking and obtaining medical practice by false and fraudulent representations as to his ability to effect cures, and by falsely and fraudulently guaranteeing cures, and that he is also guilty of gross immorality in circulating indecent and obscene literature through the mails and through the community; and the return further shows that, upon the filing of duly verified charges, as shown, the board set a date for the hearing and determination of the charges, and immediately served a copy of the charges upon the relator, with written notice upon him of the time and place of the hearing.

The provisions of the act of 1897 which affect the questions raised in this case are found in sections 1, 2, and 5. Section 1 provides: "That it shall hereafter be unlawful for any person to practice medicine, surgery or obstetrics in this State without first obtaining a license so to do, as hereinafter provided." In section 2 it is provided that any person desiring to begin the practice of medicine, surgery or obstetrics shall procure from the State board a certificate

that he is entitled to a license. In order to procure such certificate the applicant shall submit to the board his diploma, with his affidavit setting forth the time and under what circumstances it was received and that he is the person to whom it was issued. His identity as the person to whom the diploma was issued is to be further corroborated by the affidavit of two freeholders. Provision is also made for the examination of any applicant whose diploma is from a college not recognized by the board as maintaining a sufficiently high standard of medical education. Further provision is made in this section for the giving of certificates to persons already engaged in the practice of medicine under former laws. Upon the receipt of the certificates from the board and the presentation of the same to the county clerk, the applicant will be entitled to receive from the clerk the required license. In section 5, amongst other things, it is provided that the board shall fix a schedule of the minimum requirements which must be complied with by applicants for examination for license, and must also establish rules for the recognition of medical colleges, so as to keep the requirements up to the average standard of medical education in other states. In fixing such rules it is expressly provided that the board shall not "discriminate for or against any school or system of medicine." Provision is also made for refusing certificates in certain cases, and also for revoking licenses when granted.

The relator was in the practice of medicine at the time the law of 1897 took effect, under licenses procured under the act of 1885, *supra*. Those licenses he filed with the board, as required by section 2 of the act of 1897; and he claims the right to a certificate under the following provisions of said section: "All persons practicing medicine, surgery and obstetrics in

the State of Indiana when this law goes into effect, and desiring to continue the same, shall, within ninety days thereafter, obtain a certificate that they are entitled to do so by presenting to the State Board of Medical Registration and Examination the license possessed by them at the time of the passage of this law, together with an affidavit that they are the legal possessors of the same, and the persons mentioned therein, and such applicant shall pay to the board the sum of one dollar ($1.00) at the time of making such application. The board shall thereupon issue to such applicant a certificate, which, when presented to the county clerk of the proper county, shall entitle the holder to a license to practice medicine, surgery and obstetrics in the State of Indiana." If the foregoing provisions were all that were contained in the act in relation to persons already in the practice of medicine at the date of the approval of the law, there is no doubt that the relator would have been entitled to the writ of mandate asked for. The act would then mean that anyone already practicing medicine by virtue of a license issued under the old law, would be entitled to a certificate and license, to be issued under the new law. The simple fact that a license had been given under the old law would be the only evidence needed to entitle him to a license under the new law. And this is what the relator contends for. But there are provisions in section 5 of the act which materially modify the foregoing provisions of section 2, as follows: "The State Board of Medical Registration and Examination shall have the right to review the evidence upon which a license has been obtained, and if it shall be found that a license has been obtained by fraud or misrepresentation, the board may revoke such license. The board may refuse to grant a certificate to any person guilty of felony or gross immorality, or

addicted to the liquor or drug habit to such a degree as to render him unfit to practice medicine or surgery, and may, after notice and hearing, revoke a certificate for like cause.   An appeal may be taken from the action of the board."   These words certainly authorize the board to do something more than merely inspect the old license before they issue the certificate for a new one.   Under those sweeping provisions, the old license is merely *prima facie* evidence of a right to the new one.   The board, in effect, is given authority to inquire whether the former license was rightfully obtained; and, even then, if the applicant is an unfit person to practice medicine, by reason of criminal conduct or immoral character or habits, the board may refuse a certificate.   Moreover, after the giving of the certificate, provided no license has been issued upon it, the board may, after notice and hearing, revoke the same.   To protect the applicant from any injustice on the part of the board, in so refusing or revoking a certificate, the act provides for an appeal. The tribunal of appeal, though not named in this section, is the circuit or superior court of the proper county, the county of the applicant's residence, as shown in section 2 of the act.

It thus appears, when all the sections of the act, particularly sections 2 and 5, are read together, as they must be, that the relator's licenses issued to him under the act of 1885, did not necessarily entitle him to a certificate from the board, unless the board were also satisfied, upon examination, that such licenses were obtained without fraud or misrepresentation, and, besides, that the applicant was morally a fit person to engage in the practice of medicine.

As to "any person holding a license under the provisions of this act" (the act of 1897), if he be guilty of any of the acts of immorality or other wrong doing

named in section 5, it is further provided that such license "may be revoked by the board, upon the finding and judgment" of the circuit court. This provision, however, has no application to such a case as that before us, where the relator's license was granted, not under this act, but under a former law. The act of 1897, in effect, revoked such former license, as appears from section 1, above set out; and the new license can be issued in its place only in the manner set forth in the act itself. The board may revoke its own certificate, on notice and hearing, before a license has issued thereunder; but, if the license has actually issued under the new law, then it can be revoked only on the finding and judgment of the court. The appellant is therefore in error in contending that any finding or judgment of a court is necessary to the revoking of a license granted under the old law. Such license, as already said, was revoked by the law itself, in the act of 1897, and remains in force only until the board has acted upon the application for the new license. If the new license is granted, it takes the place of the old one. If it is refused, the applicant has no right to practice medicine, unless, on appeal to the court from the action of the board, the board is required to issue a license.

Whether the law is a wise one is not for the courts to say. It may be, as contended, that as men are free to choose those who shall minister to the needs of the soul, so also should they be free to choose those who shall minister to the ills of the body. It may be that such laws repress independent investigation, and so retard the progress of medical knowledge. It may be that many of the most valuable medical discoveries were made in spite of the prejudice and protest of men learned in the old and time-tested lore of their day. It may be, finally, that such laws are out of har-

mony with our free institutions, according to which each citizen may pursue his own work, his own studies, his own occupation, in so far as he does not trench on the equal rights of his fellows and the welfare of the community in which he lives. These are, however, questions for the legislature; and, so long as the act is not clearly in violation of any provision of the constitution, it cannot be held invalid. The legislature has judged that the safety of the public health requires the guards that are placed around the practice of medicine by this law; and, notwithstanding the questions made by counsel, we are unable to see that the act is not a valid exercise of the police power of the State. Had the board refused to act on the application of the relator, he could undoubtedly have compelled action. But the petition for mandate is not to compel the board to act on his application, but to compel it to grant him a certificate for a license. This, under the act, as we have seen, he cannot compel the board to do. The board must act after investigation, and then grant or refuse the application as may be found right. In case of refusal, the statute gives the right of appeal. The relator has therefore no cause to complain.

We do not understand what failure as to notice is shown in the statute. The statute itself is notice that the legislature has set aside the old licenses, and given a reasonable time in which to apply for new licenses in their place. The applicant for a new license has presented himself before the board, and of course must be held to have notice of whatever disposition the board may make of his application. In case he is granted a certificate, and the board sees fit to revoke it before he has procured his license, notice and a hearing are provided for. And if he actually receives his license, it cannot be revoked un-

til a formal action is had in court, including the filing of a verified charge against him, by way of complaint, followed by summons, finding and judgment. There is no failure of notice. Indeed, the statute of 1897 is a much more guarded and limited exercise of the police power in relation to the licensing of physicians than many that have been upheld by the courts as valid and constitutional. As said by counsel for appellees: "Statutes similar to the one under consideration, denying to all physicians in the state, lawfully engaged in practice, the right to continue such practice, until they conform to the requirements of the statute, and restricting the practice of medicine to persons who are able to demonstrate their qualifications, have been held constitutional as a proper exercise of the police power of the state in nearly every state of the union and in the Supreme Court of the United States. *Eastman*, v. *State*, 109 Ind. 278, 58 Am. Rep. 400; *Dent* v. *West Virginia*, 129 U. S. 114; *State* v. *Dent*, 25 W. Va. 1; *Ex parte Frazer*, 54 Cal. 94; *Harding* v. *People*, 10 Colo. 387, 15 Pac. 727; *Williams* v. *People*, 121 Ill. 84, 11 N. E. 881; *People* v. *Blue Mountain Joe*, 129 Ill. 370, 21 N. E. 923; *State* v. *Mosher*, 78 Iowa 321, 43 N. W. 202; *Iowa Eclectic Medical College* v. *Schrader*, 87 Iowa 659, 55 N. W. 24, 20 L. R. A. 355; *Driscoll* v. *Commonwealth*, 93 Ky. 393, 20 S. W. 431; *Hewitt* v. *Charier*, 16 Pick. 353; *People* v. *Phippin*, 70 Mich. 6, 37 N. W. 888; *State* v. *State Medical Examining Board*, 32 Minn. 324, 50 Am. Rep. 575, 20 N. W. 238; *State* v. *State Board of Medical Examiners*, 34 Minn. 387, 26 N. W. 125; *State* v. *Fleischer*, 41 Minn. 69, 42 N. W. 696; *Craig* v. *Board of Medical Examiners*, 12 Mont. 203, 29 Pac. 532; *State* v. *District Court*, 13 Mont. 370, 34 Pac. 609; *Dogge* v. *State*, 17 Neb. 140, 22 N. W. 348; *Gee Wo* v. *State*, 36 Neb.

241, 54 N. W. 513; *Ex parte Spinney*, 10 Nev. 323; *In re Roe Chung* (N. M.), 49 Pac. 952; *In re Smith*, 10 Wend. (N. Y.) 449; *People* v. *Fulda*, 52 Hun 65, 4 N. Y. Supp. 945; *State* v. *Van Doran*, 109 N. C. 864, 14 S. E. 32; *State* v. *Call* (N. C.), 28 S. E. 517; *France* v. *State* (Ohio), 47 N. E. 1041; *Barmore* v. *State Board Medical Examiners*, 21 Or. 301, 28 Pac. 8; *State* v. *Randolph*, 23 Or. 74, 31 Pac. 201, 37 Am. St. 655; *Logan* v. *State*, 5 Tex. App. p. 306; *People* v. *Hasbrouck*, 11 Utah 291; *Fox* v. *Territory*, 2 Wash. T. 297; *State* v. *Carey*, 4 Wash. 424, 30 Pac. 729.

"Similar statutes have been construed and recognized as the law in cases where their constitutionality was not questioned, as follows: *Richardson* v. *Dorman's Executrix*, 28 Ala. 679; *State* v. *Fussell*, 45 Ark. 65; *Richardson* v. *State*, 47 Ark. 562, 2 S. W. 187; *Thompson* v. *Hazen*, 25 Me. 104; *Bibber* v. *Simpson*, 59 Me. 181; *Spaulding* v. *Alford*, 1 Pick. 33; *State* v. *State Board of Health*, 103 Mo. 22, 15 S. W. 322; *Gage* v. *Censors*, 63 N. H. 92, 56 Am. Rep. 492; *Weeden* v. *Arnold* (Okl.), 49 Pac. 915; *Haworth* v. *Montgomery*, 91 Tenn. 16, 18 S. W. 399; *Townshend* v. *Gray*, 62 Vt. 373, 19 Atl. 635.

"Similar statutes have been sustained for the regulation of the practice of dentistry. *Wilkins* v. *State*, 113 Ind. 514; *Gosnell* v. *State*, 52 Ark. 228, 12 S. W. 392; *State* v. *Creditor*, 44 Kans. 565, 24 Pac. 346, 21 Am. St. 306; *State* v. *Vandersluis*, 42 Minn. 129, 42 N. W. 789.

"It has been held that the practice of pharmacy may be similarly regulated. *Hildreth* v. *Crawford*, 65 Ia. 339, 21 N. W. 667; *People* v. *Moorman*, 86 Mich. 433, 49 N. W. 263; *State* v. *Donaldson*, 41 Minn. 74, 42 N. W. 781; *State* v. *Forcier*, 65 N. H. 42, 17 Atl. 577. It has been held that the state may regulate the trade

of plumbing and limit the privilege of examinations. *Singer* v. *State*, 72 Md. 464, 8 L. R. A. 551, 19 Atl. 1044; *People* v. *Warden*, 144 N. Y. 529, 27 L. R. A. 718, 39 N. E. 686. And also engineers. *Smith* v. *Alabama*, 124 U. S. 465. And even lawyers. *State* v. *Gazlay*, 5 Ohio 14; *Goldthwaite* v. *City Council*, 50 Ala. 486; *Cohen* v. *Wright*, 22 Cal. 293; *Ex parte Yale*, 24 Cal. 242, 85 Am. Dec. 62.

"In every one of these cases it has been held that it is within the power of the General Assembly to prescribe qualifications for the practice of the professions or trades named, and to regulate and control these professions, even to the point of taking away the right to practice from persons lawfully engaged in the practice who may be deemed insufficiently qualified in the judgment of the board or official to whom the examination of the applicant has ben entrusted."

In *Eastman* v. *State, supra,* this court said: "The practice of medicine and surgery is a vocation that very nearly concerns the comfort, health and life of every person in the land. Physicians and surgeons have committed to their care the most important interests, and it is an almost imperious necessity that only persons possessing skill and knowledge should be permitted to practice medicine and surgery. For centuries the law has required physicians to possess and exercise skill and learning, for it has mulcted in damages those who pretend to be physicians and surgeons, but have neither learning nor skill. It is therefore, no new principle of law that is asserted by our statutes, but, if it were, it would not condemn the statute, for the statute is an exercise of the police power inherent in the state. It is, no one can doubt, of high importance to the community that health, limb, and life should not be left to the treatment of ignorant pretenders and charlatans. It is within the power of the

legislature to enact such laws as will protect the people from ignorant pretenders, and secure them the services of reputable, skilled, and learned men."

And, in *Dent* v. *West Virginia, supra,* it was said by the Supreme Court of the United States: "It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex and condition. This right may, in many respects be considered a distinguishing feature of our republican institutions. Here all vocations are open to every one on like conditions. All may be pursued as sources of livelihood, some requiring years of study and great learning for their successful prosecution. The interest, or, as it is sometimes termed, the estate acquired in them, that is, the right to continue their prosecution, is often of great value to the possessors, and cannot be arbitrarily taken from them, any more than their real or personal property can be thus taken. But there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed by the state for the protection of society. The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud. As one means to this end it has been the practice of different states from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely, their possession being generally ascertained upon an examination of parties by competent persons, or inferred from a certificate to them in the form of a diploma or license from an institution

established for instruction on the subjects, scientific and otherwise, with which such pursuits have to deal. The nature and extent of the qualifications required must depend primarily upon the judgment of the state as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to such calling or profession, or are unattainable by such reasonable study and application, that they can operate to deprive one of his right to pursue a lawful vocation.

"Few professions require more careful preparation by one who seeks to enter it than that of medicine. It has to deal with all those subtle and mysterious influences upon which health and life depend, and requires not only a knowledge of the properties of vegetable and mineral substances, but of the human body in all its complicated parts, and their relation to each other, as well as their influence upon the mind. The physician must be able to detect readily the presence of disease, and prescribe appropriate remedies for its removal. Every one may have occasion to consult him, but comparatively few can judge of the qualifications of learning and skill which he possesses. Reliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he possesses the requisite qualifications. Due consideration, therefore, for the protection of society may well induce the state to exclude from practice those who have not such a license, or who are found upon examination not to be fully qualified. The same reasons which control in imposing conditions, upon compliance with which the physician is allowed to practice in the first instance, may call for further conditions as new modes of treat-

ing disease are discovered, or a more thorough acquaintance is obtained of the remedial properties of vegetable and mineral substances, or a more accurate knowledge is acquired of the human system and of the agencies by which it is affected.   It would not be deemed a matter for serious discussion that a knowledge of the new acquisitions of the profession, as it · from time to time advances in its attainments for the relief of the sick and suffering, should be required for continuance in its practice, but for the earnestness with which the plaintiff in error insists that, by being compelled to obtain the certificate required, and prevented from continuing in his practice without it, he is deprived of his right and estate in his profession without due process of law.   We perceive nothing in the statute which indicates an intention of the legislature to deprive one of any of his rights.   No one has a right to practice medicine without having the necessary qualifications of learning and skill; and the statute only requires that whoever assumes, by offering to the community his services as a physician, that he possess such learning and skill, shall present evidence of it by a certificate or license from a body designated by the state as competent to judge of his qualifications."   See, also, the very recent case of *Hawker* v. *People* (U. S.), 18 Sup. Ct. Rep. 573.

While in some respects quasi-judicial, the action of the board is not judicial, any more than is the action of a county surveyor in fixing a boundary line, or of a county superintendent in giving or refusing a teacher's certificate, or the action of numberless other officers or boards in making investigations and decisions in matters committed to them.   Neither is the circumstance that an appeal is allowed from a decision of the board an indication that its action is judicial.   "The right of appeal from the action of boards

in their administrative character," it was said by this court in *Board* v. *Heaston*, 144 Ind. 583, 55 Am. St. 192, "is frequently conferred by statute. The appeal in such cases is not permitted because the action of the board is considered judicial, but it is granted as a method of getting the matter involved before a court that it may be determined judicially." Judgment affirmed.